**FILED**
**CLERK**

6/13/2016 5:16 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
DEMETRIUS HILL,

                         Plaintiff,

                                              MEMORANDUM & ORDER
           -against-                          06-CV-0126(JS)(ARL)

PAUL LAIRD, WARDEN OF MDC; MR. CLEMENS,
ASSOCIATE WARDEN; LT. FRANK MALDONADO;
CASE MANAGER MCFARLAND; DANNY GARCIA,
D.H.O.; and HENDERSON, C.O.,

                         Defendants.
---------------------------------------X
APPEARANCES
For Plaintiff:          Demetrius Hill, pro se
                        #68133-053
                        United States Penitentiary, Lewisburg
                        Inmate Mail/Parcels
                        P.O. Box 1000
                        Lewisburg, PA 17837

For Defendants
Laird, Clemens,
McFarland, Garcia,
and  Henderson:         James R. Cho, Esq.
                        Vincent Lipari, Esq.
                        United States Attorney's Office
                        oEastern District Of New York
                        271 Cadman Plaza East
                        Brooklyn, NY 11201

Lt. Maldonado:          Nicholas Gregory Kaizer, Esq.
                        Levitt & Kaizer
                        40 Fulton Street, 3rd Floor
                        New York, NY 10038

SEYBERT, District Judge:

        On January 6, 2006, incarcerated pro se plaintiff

Demetrius Hill ("Plaintiff"), commenced this action pursuant to

Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91

S. Ct. 1999, 29 L. Ed. 2d 619 (1971), against former and current prison officials, alleging, _inter alia_, First Amendment claims of retaliation for filing prison grievances. Presently pending before the Court are the following motions: (1) defendants Paul Laird ("Laird") and Daniel Garcia's ("Garcia" and, collectively, the "Moving Defendants") motion for summary judgment (Docket Entry 149); and (2) Plaintiff's motions to sever Laird's trial (Docket Entries 144 and 148). For the following reasons, the Moving Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Plaintiff's motion to sever Laird's trial is DENIED.

## BACKGROUND[1]

As set forth more fully in the Court's Memorandum and Order dated March 31, 2014, Plaintiff was an inmate at the Metropolitan Detention Center ("MDC"), a prison in Brooklyn, New York, from December 10, 2004, through July 21, 2005. (Defs.' First

---

[1] The following facts are drawn from the Local Rule 56.1 Statement filed by all defendants with the exception of Lieutenant Maldonado in support of their motion for summary judgment dated June 14, 2013 (Docket Entry 109) (the "First Summary Judgment Motion"), as well as the Moving Defendants' Second Rule 56.1 Statement (Docket Entry 149-1) submitted in conjunction with the pending motion. As addressed more fully _infra_, Plaintiff has not submitted a Rule 56.1 Counterstatement in connection with the pending motion for summary judgment. Plaintiff submitted a Rule 56.1 Counterstatement in connection with the First Summary Judgment Motion (see Docket Entry 99); however, the Court declined to consider that Counterstatement based on Plaintiff's failure to comply with Local Rule 56.1(d). (See Mar. 31, 2014 Summ. J. Order, Docket Entry 125, at 2, n.1.)

56.1 Stmt., Docket Entry 109-2, ¶ 5.) Plaintiff was housed in the Special Housing Unit (the "SHU") at MDC. (Defs.' First 56.1 Stmt. ¶ 5.) Defendants are current and former prison officials at MDC. (Defs.' First 56.1 Stmt. ¶¶ 42-56.) Laird began his tenure as the Warden at MDC in late March 2005. (Defs.' First 56.1 Stmt. ¶ 42.) Garcia served as a Disciplinary Hearing Officer at MDC. (Defs.' First 56.1 Stmt. ¶ 53.) Garcia attended SHU meetings where he "informed the other participants as to any upcoming disciplinary hearings" but did not "discuss the substance of upcoming disciplinary hearings." (Defs.' Sec. 56.1 Stmt., Docket Entry 149-1, ¶¶ 96-97.)

On May 11, 2005, Plaintiff refused to close the food slot in his cell. (Defs.' Sec. 56.1 Stmt., ¶ 44.) After reporting the incident, an officer discovered that Plaintiff had closed the food slot and placed cardboard in the locking mechanism to prevent the food slot from being locked. (Defs.' Sec. 56.1 Stmt. ¶ 45.) An incident report was completed charging Plaintiff with "refusing an order" and "tampering with and blocking a locking device." (Defs.' Sec. 56.1 Stmt. ¶ 46.) On July 6, 2005, Garcia conducted a disciplinary hearing in connection with these charges (the "Disciplinary Hearing") and issued a written decision finding Plaintiff guilty of tampering with and blocking a locking device.[2]

---

[2] Garcia did not consider the charge of refusing an order. (Discipline Hr'g Report, Garcia Decl. Ex. 1, Docket Entry 152-1,

(Defs.' Sec. 56.1 Stmt. ¶¶ 61, 83.)  Garcia revoked Plaintiff's visitation privileges for 150 days, revoked twenty-seven days of good conduct time, and imposed thirty days of disciplinary segregation.  (Defs.' 56.1 Stmt. ¶ 84; Discipline Hr'g Report at 4.)

A.  <u>The Complaint</u>

Plaintiff's Complaint alleges a series of incidents that occurred at MDC from April 2005 through July 2005 in which executive staff and correctional officers allegedly assaulted and harassed Plaintiff in retaliation for repeatedly filing administrative grievances regarding alleged staff misconduct and unconstitutional conditions of confinement.  (<u>See</u> <u>generally</u> Compl.)  Plaintiff alleges that Laird: (1) ignored Plaintiff's numerous complaints; (2) transferred Plaintiff to Lewisberg Penitentiary in retaliation for filing complaints; and (3) "turned a blind eye" and "condoned" his staff's abusive actions.  (Compl. at 6.)

Plaintiff alleges that Garcia was present at a SHU meeting in order to "learn[ ] how the administration wants particular prisoners handled."  (Compl. at 5.)  Plaintiff also asserts that defendant Associate Warden Clemens ("Clemens") and

_____

at 4.)  The Court will utilize the pagination generated by the Electronic Case Filing System when referring to the Discipline Hearing Report.

former defendant Captain Schoenfelder told Garcia to revoke Plaintiff's visits in retaliation for filing complaints. (Compl. at 5.)

I.   The First Summary Judgment Motion

On June 14, 2013, all defendants with the exception of Lieutenant Maldonado moved for summary judgment and argued that the Complaint should be dismissed based on Plaintiff's failure to exhaust his administrative remedies and failure to establish his First Amendment retaliation claims (the "First Summary Judgment Motion"). The Court determined the First Summary Judgment Motion in its Memorandum and Order dated March 31, 2014 (the "Summary Judgment Order").

The Court liberally construed the Complaint as asserting two additional claims that the moving defendants failed to address in the First Summary Judgment Motion. First, the Court held that the Complaint appeared to assert a claim against Laird for supervisor liability based on the allegation that Laird "'turned a blind eye' to the abuses of his staff and directly condoned their actions." (Summ. J. Order at 7 (quoting Compl. at 6).) Second, the Court found that Plaintiff appeared to assert a claim against Garcia for the violation of his due process rights based on Garcia's attendance at a SHU meeting to learn "'how the administration wants particular prisoners handled.'" (Summ. J. Order at 7 (quoting Compl. at 5).) The Court did not determine

the merits but "invite[d] an additional summary judgment motion on the potential additional claims against Laird and Garcia." (Summ. J. Order at 8.)

The Summary Judgment Order also addressed defendants' claim that Plaintiff failed to exhaust his administrative remedies. Particularly, the Court held that issues of fact existed as to "whether administrative remedies were actually available to Plaintiff." (Summ. J. Order at 15.) The Court noted Plaintiff's allegation that he filed administrative grievances with respect to the claims set forth in the Complaint but defendant Case Manager McFarland ("McFarland") refused to process the forms and prison staff failed to provide appeal forms to Plaintiff. (Summ. J. Order at 15.) Plaintiff also submitted an affidavit from an MDC inmate, Martin Aguilar ("Aguilar"), stating that "McFarland refused to provide Plaintiff with administrative remedy forms in order to prevent Plaintiff from filing grievances," (the "Aguilar Affidavit"). (Summ. J. Order at 15-16.)

II. Laird and Garcia's Motion

On February 29, 2016, the Moving Defendants filed an additional motion for summary judgment. (Defs.' Mot., Docket Entry 149.) The Moving Defendants allege that Plaintiff's claim against Laird for supervisory liability should be dismissed because: (1) Plaintiff did not exhaust his administrative remedies; (2) Plaintiff has failed to establish that Laird was personally

involved in the alleged unconstitutional conduct; and (3) Plaintiff has failed to demonstrate that Laird "created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom." (Defs.' Br., Docket Entry 149-2, at 4-16.) With respect to Garcia, the Moving Defendants argue that: (1) Plaintiff has failed to establish that Garcia's revocation of his visitation implicated a liberty interest; and (2) even if the Court finds that Plaintiff possessed a liberty interest, Plaintiff received sufficient due process. (Defs.' Br. at 18-23.) Finally, the Moving Defendants allege that they are both entitled to qualified immunity. (Defs.' Br. at 23-25.)

Plaintiff argues that administrative remedies were unavailable to him and asserts that the Court's prior determination that issues of fact exist respecting exhaustion is applicable to Laird. (Pl.'s Opp., Docket Entry 159, at 3, 10.)[3] Plaintiff argues that Laird was directly involved in constitutional violations by: (1) directing unit managers to cease providing Plaintiff with administrative remedy forms; (2) assigning Maldonado, an "abusive lieutenant," to work in the SHU in order to

---

[3] The Court will utilize the Electronic Case Filing pagination for Plaintiff's submission in opposition to the pending motion. The Court notes that Plaintiff's opposition contains a memorandum of law, and multiple affidavits, and exhibits all filed as one document.

deter the filing of grievances; (3) ensuring that "prisoners 'informally resolved' complaints"; and (4) "repeatedly rejecting administrative remedies." (Pl.'s Opp. at 15-16.) Plaintiff also avers that Laird created a policy and custom of deterrence by directing subordinates to stop providing grievance forms to Plaintiff. (Pl.'s Opp. at 13.) Plaintiff further argues that Laird "created the pattern and practice of retaliatory attacks against prisoners who filed, or attempted to file [grievances]." (Pl.'s Opp. at 16.)

Plaintiff notes that the Moving Defendants concede that Garcia advised executive staff about imminent disciplinary hearings during SHU meetings. (Pl.'s Opp. at 20.) Plaintiff avers that there is no reason for the executive staff to need to obtain information about approaching disciplinary hearings "if not to influence the outcome of specific DHO hearings . . . ." (Pl.'s Opp. at 20 (emphasis in original).) Plaintiff alleges that Garcia revoked his visitation to deter him from filing administrative complaints. (Pl.'s Opp. at 22.) Finally, Plaintiff argues that the Moving Defendants are not entitled to qualified immunity because "at the time of the incidents in question, the filing of grievances (admin. Rem.) was and is protected by the First Amendment." (Pl.'s Opp. at 23.)

III. <u>Plaintiff's Motions to Sever</u>

On October 26, 2015, Plaintiff filed a letter motion requesting that the Court "sever def. Laird, and allow the other defendants to stand trial in this civil rights litigation." (Pl.'s Mot., Docket Entry 144, at 1.) Plaintiff alleges that he is suing Laird for permitting a "pattern and practice of civil rights abuses and excessive force of Plaintiff in particular" and for turning a "blind eye" toward abusive staff. (Pl.'s Mot. at 1.) Plaintiff contrasts his claims against Laird with his claims against Laird's co-defendants, who are "being sued for 'specific' and 'repeated' acts of abuse and excessive force." (Pl.'s Mot. at 2.) Plaintiff requested that the Court schedule the trial of the "first defendants" for late December, 2015. (Pl.'s Mot. at 3.)

On February 4, 2016, Plaintiff filed an additional motion to "sever the trial of 'Warden Laird.'" (Pl.'s Sec. Mot., Docket Entry 148, at 1.) Plaintiff again alleges that Laird is being sued based on "pattern and practice liability" and seeks to sever Laird's trial from that of the remaining defendants "to avoid confusion in terms of the liability of the other defendants who actually perpetrated the constitutional violations personally." (Pl.'s Sec. Mot. at 1-2.)

<u>DISCUSSION</u>

I.  <u>Motion for Summary Judgment</u>

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with other firsthand information that includes but is not limited to affidavits.  <u>Nnebe v. Daus</u>, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  <u>Gallo v. Prudential Residential Servs., L.P.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  <u>Giglio v. Buonnadonna Shoprite LLC</u>, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  <u>Id.</u>  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and

10

draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

On a motion for summary judgment, the Court must liberally construe a pro se litigant's complaint and "read a pro se litigant's supporting papers liberally, interpreting them to raise the strongest arguments that they suggest." Adeyi v. U.S., No. 06-CV-3842, 2010 WL 520544, at *3 (E.D.N.Y. Feb. 8, 2010) (internal quotation marks and citations omitted). Nevertheless, a litigant's pro se status does not excuse him from the general requirements of summary judgment and "bald assertion[s] unsupported by evidence" will not suffice to overcome summary judgment. Id. (internal quotation marks and citations omitted).

A.    Local Rule 56.1

Local Civil Rule 56.1 requires, inter alia, that: (1) the party moving for summary judgment submit a statement of undisputed material facts, and (2) the opposing party submit a corresponding statement responding to each paragraph in the moving party's statement. LOCAL RULE 56.1(a)-(b). Where the non-movant fails to submit an appropriate counterstatement of material facts, "courts have deemed the moving party's statement of facts to be admitted and have granted summary judgment in favor of the moving

11

party on the basis of uncontroverted facts." D'Nelson v. Costco Wholesale Corp., No. 03-CV-0219, 2006 WL 767866, at *3 (E.D.N.Y. Mar. 24, 2006). Here, the Moving Defendants filed a Rule 56.1 Statement in support of their pending motion and served Plaintiff with a Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment as well as a copy of Rule 56.1. (See Defs.' Ex. D, Docket Entry 149-3.) However, Plaintiff failed to submit a corresponding counterstatement. Nevertheless, based on Plaintiff's pro se status, the Court will exercise its discretion to "overlook" Plaintiff's failure to submit a Rule 56.1 Counterstatement. McLean v. Metropolitan Jewish Geriatric Ctr., No. 11-CV-3065, 2013 WL 5744467, at *1 (E.D.N.Y. Oct. 23, 2013). Thus, "the Court will deem admitted only those facts that are supported by the record and not controverted by other admissible evidence." Id. (citation omitted).

B.    Exhaustion of Administrative Remedies

As previously noted, this Court has already determined that issues of fact exist as to whether Plaintiff exhausted his administrative remedies and, particularly, "whether administrative remedies were actually available to Plaintiff." (Summ. J. Order at 15.) While the Moving Defendants have asserted extensive arguments regarding Plaintiff's purported failure to exhaust his administrative remedies, the Court declines to revisit its prior determination. (Defs.' Br. at 4-10.) Indeed, the Court's

"invitation" to Laird and Garcia to file an additional motion for summary judgment was narrow; the Court did not grant leave to reargue the issue of exhaustion. (Summ. J. Order at 7-8.) Accordingly, the Court disregards the portions of the Moving Defendants' briefs addressing exhaustion of administrative remedies.

    C.    <u>Warden Laird</u>

    Laird argues that Plaintiff's supervisory liability claim must fail in the absence of any triable issues of fact respecting his personal involvement in constitutional violations. (Defs.' Br. at 10-16.) The Court disagrees.

    In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), the plaintiff filed a <u>Bivens</u> action against federal officials and corrections officers and alleged that he was deprived of constitutional protections during his incarceration. <u>Iqbal</u>, 556 U.S. at 666-68. In determining whether the complaint was sufficiently pled, the Supreme Court, <u>inter</u> <u>alia</u>, reaffirmed that on a <u>Bivens</u> claim, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of <u>respondeat</u> <u>superior</u>." <u>Iqbal</u>, 556 U.S. at 676. The Court held that while the factors necessary to demonstrate a <u>Bivens</u> claim vary depending on the subject constitutional provision, a claim of discrimination in violation of the First or Fifth Amendments require "that the plaintiff must plead and prove

that the defendant acted with discriminatory purpose." Id. The Court rejected the argument that a supervisory official's knowledge of the discriminatory purpose of his subordinate establishes a constitutional violation and held that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Id. at 677 (Noting that "purpose rather than knowledge" is required to establish Bivens liability with respect to "an official charged with violations arising from his or her superintendent responsibilities.").

Prior to Iqbal, the Second Circuit held that a supervisory defendant's "personal involvement" in a constitutional violation may be established based on evidence that:

> (1) The defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). The question of whether the Colon test for supervisory liability survives Iqbal has "engendered conflict" within the Second Circuit. Reynolds v.

14

<u>Barrett</u>, 685 F.3d 193, 205 n.14 (2d Cir. 2012). The Second Circuit has not yet determined <u>Iqbal's</u> impact on non-discrimination claims and district courts have effectively fallen into "two camps," with some courts holding that <u>Iqbal</u> eradicated the second, fourth, and fifth <u>Colon</u> factors and other courts holding that "the viability of the second, fourth, and fifth <u>Colon</u> factors depends on the underlying constitutional claim." <u>Marom v. City of N.Y.</u>, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (collecting cases). <u>See also</u> <u>Vazquez-Mentado v. Buitron</u>, 995 F. Supp. 2d 93, 96-97 (N.D.N.Y. 2014) ("The majority of district courts, however, have held that, absent any contrary directive from the Second Circuit, all five <u>Colon</u> factors survive where . . . the constitutional violation at issue does not require a showing of discriminatory intent.") (collecting cases).

This Court previously held that "the weight of authority among the district courts in the Eastern District of New York suggests that only two of the <u>Colon</u> factors--direct participation and the creation of a policy or custom--survive <u>Iqbal</u>." <u>Butler v. Suffolk Cty.</u>, 289 F.R.D. 80, 94, n.8 (E.D.N.Y. 2013) (citations omitted). <u>Accord</u> <u>Stancati v. Cty. of Nassau</u>, No. 14-CV-2694, 2015 WL 1529859, at *3, n.4 (E.D.N.Y. Mar. 31, 2015). In the absence of additional guidance from the Supreme Court or Second Circuit, this Court continues to conclude that only the first and third <u>Colon</u> factors continue to be viable post-<u>Iqbal</u>. <u>Cf.</u> <u>Doe v. N.Y.</u>,

97 F. Supp. 3d 5, 12 (E.D.N.Y. 2015) ("This Court remains skeptical that all five of the Colon factors survive under Iqbal. However, unless or until the Second Circuit or Supreme Court rule otherwise . . . at least the first and third Colon avenue for supervisory liability survive in their entirety."). See also Marom, 2016 WL 916424, at *15 ("[T]he second, fourth, and fifth Colon factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement.").

Accordingly, the Court will analyze the first and third Colon factors--direct participation and creation of a policy or custom--in determining whether any issues of fact exist with respect to Plaintiff's supervisory liability claim.

1.   Direct Participation

At the outset, the Court notes that Plaintiff's present position that Laird directly participated in constitutional violations entirely contradicts his prior filings in this matter. Particularly, Plaintiff's first motion to sever Laird from this case states that "def. Laird is being sued for allowing a pattern and practice of civil rights abuses and excessive force of Plaintiff in particular and in general while he was Warden of MDC . . . [h]e is not being sued for perpetrating these acts against 'Plaintiff' personally."   (Pl.'s First Mot. at 1.)   In his subsequent motion to sever Laird, Plaintiff again asserts that

"[d]ue to the fact Def. Laird is being sued for a pattern and practice liability, I would urge the court to sever the litigation to avoid confusion in terms of the liability of the other defendants, who actually perpetrated the constitutional violations personally." (Pl.'s Sec. Mot. at 1-2.)

Notwithstanding Plaintiff's inconsistent litigation positions, the Court will consider Plaintiff's arguments regarding Laird's direct participation in unconstitutional conduct in light of his pro se status. As previously noted, Plaintiff alleges that Laird directly participated in constitutional violations by: (1) directing unit managers to stop providing him with administrative remedy forms, (2) assigning Maldonado to SHU to deter complaints, (3) ensuring that "prisoners 'informally resolved' complaints", and (4) "repeatedly rejecting administrative remed[ies]." (Pl.'s Opp. at 15-16.) The Court will address each asserted basis for direct participation in turn.

a.    Instruction to Stop Providing Grievance Forms

The Court liberally construes Plaintiff's opposition as arguing that there are triable issues of fact with respect to Laird's direct participation in constitutional violations based on his alleged instruction to his subordinates to cease providing administrative remedy forms to Plaintiff and to deter Plaintiff from filing grievances. (Pl.'s Opp. at 15-16.) In support, Plaintiff alleges: (1) that he was "told by Lt. Wilkens, Lt.

Maldonado and Lt. Torres that Warden Laird at the SHU meeting had directed each of them to stop me from filing administrative remed[ie]s," (Pl.'s Opp. at 27, ¶ 4), and (2) that he "specifically observed def. Laird enter Dupree Harris' ("Harris") cell and confiscate administrative remedies" (Pl.'s Opp. at 27, ¶ 3). Plaintiff also resubmitted the Aguilar Affidavit, (Pl.'s Opp. at 35-36), and asserts that Harris will testify that he observed Laird confiscate forms from Plaintiff's cell (Pl.'s Opp. at 25, ¶ 4).

Laird asserts in a signed declaration[4] that he did not deter or prevent Plaintiff from filing grievances, he did not remove administrative remedy forms from the cells of any inmates, including Plaintiff, and that he did not instruct his subordinates to remove administrative remedy forms from Plaintiff's cell or to otherwise prevent him from filing these grievances. (Laird Decl., Docket Entry 151, ¶¶ 3-7.) Similarly, in her response to Plaintiff's interrogatories, non-party Lieutenant Muriel Wilkins ("Wilkins") "denies that she was instructed to search plaintiff's cell and confiscate plaintiff's BP-8s, BP-9s, BP-10s, BP-11s or any other administrative remedy forms that plaintiff may have had in his cell." (Wilkins' Resp., Docket Entry 165-2, at 5.)

---

[4] The Court notes that Laird submitted a signed declaration rather than a notarized affidavit.

The Court finds that Plaintiff has raised triable issues of fact as to Laird's direct participation in retaliation against him in contravention of the First Amendment. The Aguilar Affidavit states, in relevant part: "I watched and heard Warden Laird and A.W. Clemens tell Lt. Wilkens to 'stop Hill from filing, he goes to rec. go in that cell and take any forms you find.'"[5] (Pl.'s Opp. at 36 (emphasis in original).) Additionally, as previously noted, Plaintiff alleges that Wilkens, Maldonado, and Torres told him that Laird directed them to stop Plaintiff from filing grievances. (Pl.'s Opp. at 27, ¶ 4.) While Laird argues that this allegation constitutes inadmissible hearsay, Defs.' Reply Br. at 4, the Court may consider hearsay on a motion for summary judgment where there is a showing that admissible evidence will corroborate the hearsay at trial. Isaacs v. Mid Am. Body & Equipment Co., 720 F. Supp. 255, 256 (E.D.N.Y. 1989), aff'd, 141 F.3d 1151 (2d Cir. 1998). See also Bldg. Indus. Fund v. Local Union 3, Int'l Bhd. of Elec. Workers, AFL-CIO, 992 F. Supp. 162,

---

[5] Laird alleges that Aguilar's statement conflicts with Plaintiff's deposition testimony that Laird did not personally remove grievance forms from Plaintiff's cell. (Defs.' Br. at 15.) However, Plaintiff's deposition was conducted on December 23, 2009, and the Aguilar Affidavit is dated July 5, 2011. (See Pl.'s Dep. Tr., Cho Decl. Ex. 1, Docket Entry 153-1 at 2; Pl.'s Opp. at 36.) As Plaintiff's deposition took place approximately two years prior to the date of the Aguilar Affidavit, it is possible that Plaintiff was unaware that Aguilar allegedly saw Laird remove grievance forms from his cell at the time of his deposition.

173 (E.D.N.Y. 1996) ("Plaintiffs have not made any showing that the various statements that involve hearsay, and sometimes double hearsay, will be offered in admissible form at trial, e.g., by calling the declarants to the stand or proving by some other admissible means that certain incidents occurred.").

The Court acknowledges that Laird has denied that he directed his subordinates to confiscate Plaintiff's administrative remedy forms and that Wilkens stated in her interrogatory response that Laird did not direct her to confiscate Plaintiff's forms. However, the Court is equally mindful that Laird's deposition has not yet taken place and may yield admissible evidence in support of Plaintiff's allegation. Additionally, in theory, Plaintiff may be able to substantiate this allegation by way of trial testimony from the other parties to the alleged conversation, i.e., Maldonado or Torres. The Court is not persuaded by Laird's argument that Plaintiff's admission that he received grievance forms during the relevant time period renders it impossible that Laird directed his subordinates to stop Plaintiff from filing grievances. (Defs.' Reply, Docket Entry 164, at 10.)

The Court declines to consider Plaintiff's assertion that Harris will testify that he observed Laird enter Plaintiff's cell and confiscate administrative remedy forms in the absence of

an affidavit from Harris or any other evidentiary support.[6] (Pl.'s
Opp. at 25, ¶ 4.)  For the same reason, the Court declines to
consider Plaintiff's assertion that Ronnie Spells will testify
that Laird retaliated against him and told him that he would remain
in SHU if he filed any grievances.  (Pl.'s Opp. at 25, ¶ 3.)

Finally, Plaintiff's allegation that he observed Laird
confiscate administrative remedy forms from Harris' cell (Pl.'s
Opp. at 27, ¶ 3) does not establish that Laird directly
participated in constitutional violations against Plaintiff.

### b.  Assignment of Maldonado to the SHU

The Court finds that Plaintiff's allegation that Laird
assigned Maldonado to the SHU is inconsistent with his deposition
testimony.  When asked during his deposition if Clemens committed
any other unlawful actions during April through July 2005,
Plaintiff responded:

> A.  I would just say . . . that I believe that
> [Clemens] . . . having Lieutenant Wilkins
> moved out of the Special Housing Unit so that
> he could put someone in the Special Housing
> Unit who would act out the abuses that he
> wanted was also a--
>
> Q.  Who--who was that?
>
> A.  Maldonado.  He put Maldonado . . . in the
> Special Housing unit.

---

[6] Plaintiff asserts that he is "currently confined to USP
Lewisberg and am unable to obtain affidavits from . . . Dupree
Harris . . . ."  (Pl.'s Opp. at 25, ¶ 1.)  However, Plaintiff
fails to provide further detail as to why he is allegedly unable
to contact Harris.

(Pl.'s Dep. Tr. at 229:5-22.) Plaintiff volunteered this information and there is no hint of ambiguity in his testimony that Clemens "put" Maldonado in the SHU. Moreover, Plaintiff has not proffered any evidence to support the notion that Laird assigned Maldonado to SHU. See Britt v. Thermald Realty I., LP, No. 13-CV-8289, 2015 WL 4922977, at *8 (S.D.N.Y. Aug. 18, 2015).

### c. Informal Resolution of Complaints

Plaintiff's unsupported statement that Laird "personally ensure[d] prisoners 'informally resolved' complaints," (Pl.'s Opp. at 15), does not support a finding of Laird's direct involvement in constitutional violations. Plaintiff's allegation that he "was directed to 'informally resolve' the BP-9s [he] had filed [because] Warden Laird and executive staff did not want any filing of remedies," (Pl.'s Opp. at 27-28, ¶ 5), is inconsistent with his allegation that "[d]espite the requirements of 28 CFR 542.13(a) Warden Laird failed to create or distribute to MDC prisoners a[n] Informal Resolution process after becoming Warden of MDC," (Pl.'s Opp. at 3). Moreover, the Court notes that in addition to mandating that wardens establish procedures for the informal aresolution of inmate complaints, 28 C.F.R. § 542.13(a) provides, with certain exceptions, that "an inmate shall first present an issue of concern informally to staff and staff, shall attempt to informally resolve the issue before an inmate submits a Request

for Administrative Remedy." Thus, to the extent that Laird encouraged prisoners to informally resolve complaints, such conduct—without more—does not demonstrate direct participation in constitutional violations.

### d. Rejection of Administrative Remedies

Finally, Plaintiff asserts that Laird repeatedly rejected his administrative remedies. (Pl.'s Opp. at 16; 29, ¶ 8 ("Def. Laird did absolutely nothing to redress the informal complaints I handed him personally or the 39 administrative remed[ie]s I had filed").) However, "sending letters or grievances to a prison official, without more, is insufficient to establish the personal involvement of the prison official." McFadden v. Friedman, No. 12-CV-0685, 2015 WL 5603433, at *19 (N.D.N.Y. Sept. 23, 2015). Additionally, a plaintiff's claim that a prison official failed to investigate misconduct accusations requires more than the mere assertion that the plaintiff sent a letter to the official. Id. See also Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) (Holding that the prison commissioner could not be held liable on a Section 1983 claim "on the sole basis that he did not act in response to letters of protest sent by [plaintiff]."). The Court finds that Plaintiff's vague allegations of Laird's alleged failure to address his complaints does not raise triable issues of fact regarding direct participation. (See Pl.'s Opp. at 29, ¶ 8; Pl.'s Supp. Br., Docket

Entry 159-1, at 5 ("Plaintiff filed over 39 Administrative remedies and on all those that related to staff abuse, harassment or excessive force Warden Laird responded by saying – <u>the allegations would be investigated, however you will not be told the outcome of said investigation</u>. . . .") (emphasis in original).)

2. <u>Creation of a Policy or Custom</u>

Plaintiff alleges that Laird created a policy or custom by: (1) directing subordinates to stop providing administrative remedy forms and to stop processing complaints, and (2) "creat[ing] the pattern and practice of retaliatory attacks against prisoners who filed, or attempted to file Admin[istrative] Rem[edies]." (Pl.'s Opp. at 13, 16-18.)

The Court finds that Plaintiff has raised issues of fact with respect to Laird's alleged policy of deterring inmates--and Plaintiff, in particular--from filing administrative remedies. As previously noted, Aguilar alleges that he heard Laird and Clemens tell Wilkens to stop Plaintiff from filing grievances and to take forms from his cell, and Plaintiff has asserted that MDC officers told him that Laird instructed them to stop him from filing grievances. (Pl.'s Opp. at 27, ¶ 4; 36, ¶ 14.) Plaintiff also alleges that he observed Laird confiscate administrative remedies from Harris' cell. (Pl.'s Opp. at 27, ¶ 3.)

However, the Court finds that Plaintiff has failed to raise issues of fact regarding his allegation that Laird engineered

a policy of retaliating against prisoners who filed grievances. (Pl.'s Opp. at 16.) Although Plaintiff asserts that he was retaliated against each time he filed an administrative remedy and that his placement in ambulatory restraints for over six hours was "specifically approved by Warden Laird," he provides no evidence that would connect Laird to this alleged retaliation aside from his conclusory allegation. (Pl.'s Opp. at 28, ¶ 7.)

Accordingly, the Court DENIES the Moving Defendants' motion for summary judgment with respect to Plaintiff's supervisory liability claim against Laird.

### 3. Qualified Immunity

On June 10, 2016, defendants Laird, Clemens, McFarland, Garcia, and C.O. Henderson filed a letter motion requesting, <u>inter alia</u>, that the Court permit supplemental briefing on the issue of qualified immunity in light of the Second Circuit's recent decision in <u>McGowan v. United States of America</u>, --- F.3d ---, 2016 WL 3163061 (2d Cir. 2016). (Defs.' Ltr., Docket Entry 183.) The Court's Electronic Order dated June 13, 2016 granted that request for supplemental briefing and scheduled oral argument on the issue of qualified immunity for July 11, 2016. As a result, the Court will reserve judgment on whether Laird is entitled to qualified immunity. The Court will determine whether Laird and his co-defendants are entitled to qualified immunity after hearing oral argument on this issue.

D.   <u>D.H.O. Garcia</u>

The Fourteenth Amendment provides, in relevant part: "nor shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. C<small>ONST</small>. Amend. XIV. The Court analyzes procedural due process in two steps: <u>First</u>, the Court determines whether a liberty or property interest has been interfered with; and <u>Second</u>, the Court determines whether the procedures implicated in the subject deprivation were "constitutionally sufficient."  <u>Kentucky Dep't of Corr. v. Thompson</u>, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506 (1989).

1.   <u>Interference with a Liberty Interest</u>

Protected liberty interests originate from either the Due Process Clause or state law.  <u>Id.</u>  In <u>Sandin v. Conner</u>, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), the Supreme Court held that while states may create liberty interests subject to protection by the Due Process Clause, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 484, 115 S. Ct.  at 2301 (internal citations omitted).  The Second Circuit has utilized a two-part test to

26

determine whether a liberty interest is created pursuant to a state statute or regulation: "the inmate must establish that his confinement or restraint (1) creates an atypical and significant hardship . . . in relation to the ordinary incidents of prison life, and (2) that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." Arce v. Walker, 139 F.3d 329, 334 (2d Cir. 1998) (internal quotation marks and citations omitted (ellipsis in original)).

The sanction imposed against Plaintiff in connection with the Disciplinary Hearing contained three components: (1) 150 day loss of visitation; (2) twenty-seven day loss of good conduct time; and (3) thirty days of disciplinary segregation. (Discipline Hr'g Report at 3.) The Court broadly construes Plaintiff's Complaint and/or opposition as asserting that Plaintiff was deprived of due process because Garcia was influenced by MDC officials at the SHU meeting to impose the previously noted sanctions. At the outset, the Court will determine whether each sanction implicates a liberty interest.

### a. Loss of Visitation

"While courts have uniformly rejected the claim that a liberty interest in prison visitation is inherent in the Due Process clause itself, state law has been found to create such an interest in certain contexts." Chimurenga v. City of N.Y., 45 F.

Supp. 2d 337, 341 (S.D.N.Y. 1999) (internal citations omitted). The Court's determination as to whether the denial of visitation constitutes an "atypical significant hardship" sufficient to implicate a liberty interest under Sandin is fact-specific. Amaker v. Goord, No. 98-CV-3634, 1999 WL 511990, at *13 (S.D.N.Y. July 20, 1999) (Holding that the denial of one visit was not an atypical and significant hardship.). However, it is worthy of note that "courts in the Second Circuit have consistently held that neither the Due Process Clause nor New York state law create a protected liberty interest for inmates with respect to contact visits." Hernandez v. Sposato, No. 14-CV-4593, 2015 WL 4097784, at *4 (E.D.N.Y. Jul. 8, 2015) (collecting cases). See, e.g., Zimmerman v. Burge, No. 06-CV-0176, 2008 WL 850677, at *2 (N.D.N.Y. Mar. 28, 2008) ("[T]here is abundant case law establishing that inmates have no liberty or property interest in contact visits.").

The Court is mindful both that Plaintiff was placed in solitary confinement during his incarceration at MDC (Pl.'s Opp. at 22), and that the record appears to indicate that all of Plaintiff's visits (namely, both contact and non-contact visitation) were revoked in connection with the Disciplinary Hearing (see generally Discipline Hr'g Report). Nevertheless, the Court finds that Plaintiff has not asserted any facts that would render his 150-day visitation suspension an "atypical and significant hardship." See Sandin, 515 U.S. at 484. (See

generally Pl.'s Opp.)  Accordingly, the Court finds that Plaintiff did not possess a liberty interest with respect to the revocation of his visitation.

b.    Good Conduct Time

"Although inmates have a liberty interest in good time credit they have already earned, no such interest has been recognized in the opportunity to earn good time credit where . . . prison officials have discretion to determine whether an inmate or class of inmates is eligible to earn good time credit."  Abed v. Armstrong, 209 F. 3d 63, 66-67 (2d Cir. 2000) (citations omitted).  Neither party has addressed Plaintiff's loss of good conduct time.  Nevertheless, the Court finds that there are issues of fact as to whether Plaintiff possessed a liberty interest in this loss.  The record does not clearly indicate whether Plaintiff lost eligibility to accrue twenty-seven additional days of good conduct time or whether he lost twenty-seven days of previously accrued good conduct time.  To the extent Plaintiff suffered a loss of previously accrued good conduct time, that loss would implicate a liberty interest.

c.    Disciplinary Segregation

"[Thirty] days in disciplinary segregation does not compromise a constitutionally-protectable liberty interest." Washington v. Donahue, --- F. Supp. 3d ---, 2015 WL 7731457, at *3 (W.D.N.Y. 2015) (citing Sandin, 515 U.S. at 486).  Thus, Plaintiff

does not possess a liberty interest in his thirty-day disciplinary segregation.

2. <u>Sufficiency of Procedures</u>

Notwithstanding the lack of clarity as to whether Plaintiff's forfeited good time credits were previously accrued or constituted future credits to be earned, the Court will determine whether Plaintiff was afforded sufficient due process in connection with the revocation of his good time credits.

While the "full panoply of rights" afforded to a defendant in a criminal prosecution do not apply to a prison disciplinary proceeding, procedural due process requires that an inmate receive:

> [A]dvance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

<u>Sira v. Morton</u>, 380 F.3d 57, 69 (2d Cir. 2004). Additionally, the revocation of good time credits requires that the prison disciplinary board's findings be "supported by some evidence in the record." <u>Williams v. Menifee</u>, 331 F. App'x 59, 60-61 (2d Cir. 2009) (internal quotation marks and citation omitted).

Plaintiff does not dispute that he was provided with adequate notice, the opportunity to call witnesses and present

evidence at a hearing, and a written statement of the disposition. (See generally Pl.'s Opp. at 20-22.)  Indeed, the record supports that Plaintiff was afforded these due process considerations.  (See generally Discipline Hr'g Report.)  The Court liberally construes Plaintiff's opposition as arguing that Garcia was biased because he attended SHU meetings.  (Pl.'s Opp. at 20.)  As previously noted, the Complaint alleges that Garcia attended SHU meetings in order to "learn[ ] how the administration wants particular prisoners handled." (Compl. at 5.)  While Garcia does not dispute that he attended SHU meetings and "inform[ed] the other participants as to any upcoming hearings," he asserts that he did not discuss the "substance" of the upcoming hearings at these meetings.  (Garcia Decl., Docket Entry 152, ¶¶ 53-54.)

A hearing officer is required to "not be so insufficiently impartial as to present 'a hazard of arbitrary decisionmaking.'" Benitez v. Schlaggel, No. 93-CV-3960, 1995 WL 581716, at *5 (S.D.N.Y. Oct. 4, 1995) (quoting Wolff v. McDonnell, 418 U.S. 539, 571, 94 S. Ct. 2963, 2982, 41 L. Ed. 2d 935 (1974)). However, there is a rebuttable presumption that prison officials serving as adjudicators are impartial.  Smith v. U.S., No. 09-CV-0729, 2011 WL 777969, at *9 (N.D.N.Y. Feb. 3, 2011), report and recommendation adopted, 2011 WL 776150 (N.D.N.Y. Mar. 3, 2011). While an inmate is entitled to a hearing that is not based on a prejudged determination of guilt, "an inmate is not entitled to a

hearing officer with the same level of impartiality required by judges." Scott v. Frederick, No. 13-CV-0605, 2015 WL 127864, at *14 (N.D.N.Y. Jan. 8, 2015) (emphasis in original).

A hearing officer is impartial where the record contains reliable evidence to support her findings. Id. See also Smith, 2011 WL 777969, at *9 ("An impartial hearing officer is one who does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen.") (internal quotation marks and citation omitted) (ellipsis in original). "'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached.'" Id. (quoting Superintendent v. Hill, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 2774, 86 L. Ed. 2d 356 (1985)).

The Court finds that Plaintiff has failed to rebut Garcia's presumption of impartiality and has not raised issues of fact as to the adequacy of the due process he received. The Court previously determined that: "even without an improper motivation Garcia still would have revoked Plaintiff's visitation privileges. Defendants have submitted unrebutted evidence that Garcia suspended Plaintiff's visitation privileges for 150 days because Plaintiff violated a BOP regulation prohibiting inmates from

interfering with security devices in the prison." (Summ. J. Order at 27-28.) Indeed, Garcia has proffered a Discipline Hearing Officer Report indicating that he considered a statement from Plaintiff, testimony from Maldonado, and a memorandum submitted by the reporting officer in rendering his determination. (Discipline Hr'g Report at 1-2.) The Court finds that Garcia's finding of guilt was based on reliable evidence.

The Court also finds that both the record and the Code of Federal Regulations support the sanctions imposed by Garcia. Plaintiff was charged with "destroying or tampering with or blocking any lock device" pursuant to Code 208,[7] which constitutes a high severity level prohibited act. (Discipline Hr'g Report at 2.) The available sanctions for high severity level prohibited acts include, but are not limited to: "forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended)."[8] 28 C.F.R. § 541.3. Additionally, the subject disciplinary charge was Plaintiff's second

---

[7] Plaintiff was also charged with refusing an order pursuant to Code 307; however, Garcia did not consider that charge. (Discipline Hr'g Report at 3.)

[8] The available sanctions for high severity level prohibited acts also include up to six months of disciplinary segregation and "loss of privileges (e.g., visiting, telephone, commissary, movies, recreation)." 28 C.F.R. § 541.3.

disciplinary violation within an eighteen-month period. (Discipline Hr'g Report at 3, 11.)

Accordingly, Garcia's motion for summary is GRANTED in the absence of triable issues of fact respecting the due process afforded Plaintiff in connection with the Disciplinary Hearing.

## II. Motion to Sever Laird's Trial

Federal Rule of Civil Procedure 42 provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." FED. R. CIV. P. 42(b). In determining whether to grant a motion to sever, the Court generally considers the following factors:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

Picaro v. Pelham 1135 LLC, No. 14-CV-7398, 2015 WL 1854272, at *4 (S.D.N.Y. Apr. 21, 2015). The determination of a severance motion is within the Court's sound discretion. Id.

The Court finds that there is no basis to sever Laird's trial from the trial of his co-defendants. Plaintiff's claim against Laird for supervisory liability shares common issues of fact with his claims against the remaining defendants. Indeed, as

previously noted, Plaintiff alleges that Laird directed certain defendants to stop providing Plaintiff with administrative remedies.  While Plaintiff argues that the inclusion of Laird in a trial with his co-defendants will create "confusion," the Court disagrees and finds that Plaintiff will not be prejudiced by the trial of Laird with his co-defendants.  Accordingly, the Court DENIES Plaintiff's motions to sever.  To the extent Plaintiff requested a trial date in late December 2015, that request is moot as a trial has been scheduled in this matter for July 2016.

CONCLUSION

For the forgoing reasons, the Moving Defendants' motion for summary judgment (Docket Entry 149) is GRANTED IN PART and DENIED IN PART.  Summary judgment is DENIED with respect to Plaintiff's supervisory liability claim against Laird and summary judgment is GRANTED with respect to Plaintiff's due process claim against Garcia.  Plaintiff's motions to sever (Docket Entries 144 and 148) are DENIED.  The Clerk of the Court is directed to TERMINATE Danny Garcia, D.H.O., as a defendant in this action. The Clerk of the Court is further directed to mail a copy of this Memorandum and Order to the pro se Plaintiff.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    June    13   , 2016
          Central Islip, New York